## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES, *for the use of* <br> RICHARD FREDERICK, <br> 12-16 and 2-16 Lamar Building <br> 1st Floor, Suite #4, Bridge Street <br> Castries, Saint Lucia <br><br> Plaintiff, <br><br> v. <br><br> ANDREA HILLYER <br> Unit 8100 DPO <br> Armed Forces Europe 09812 <br><br> SUSAN CHAINER <br> 450 N Federal Hwy, Unit 1112 <br> Boynton Beach, FL 33435 <br><br> EUGENE SWEENEY <br> 1629 NE 3rd Ct <br> Fort Lauderdale, FL 33301 <br><br> GEORGE DETERVILLE <br> Office of the Prime Minister <br> 5th Floor, Greaham Louisy Administrative Bldg. <br> Waterfront, Castries, Saint Lucia <br><br> JOHN DOE 1 <br><br> JOHN DOE 2 <br><br> Defendants. | Civil Action No. _____ |

## COMPLAINT

**THE UNITED STATES OF AMERICA for the use of RICHARD FREDERICK,**

("Frederick"), by and through his attorneys, brings this Complaint against Andrea Hillyer *et al.* and alleges as follows:

1

## PARTIES

1. Relator Richard Frederick ("Frederick") is a citizen of Saint Lucia, a sovereign island nation in the eastern Caribbean Sea.

2. Frederick is a skilled and respected attorney. He has been a Member of Parliament in Saint Lucia since 2006 and served as the Minister for Housing, Urban Renewal and Local Government from January 2007 until September 2011.

3. Defendant Andrea Hillyer ("Hillyer") is a citizen of the United States. She owns property in Florida and is a member of the Florida Bar, with which she has registered a Diplomatic Post Office address. Her physical residence is not presently known to Frederick. At all times relevant to this Complaint, she was employed by the United States Department of State, headquartered in this district, as a consular officer in the Bridgetown Embassy

4. Defendant Susan Chainer ("Chainer") is a United States citizen and a resident of Florida and Saint Lucia. She was employed as a legal attaché stationed at the United States Embassy to Barbados and the Eastern Caribbean, located at Bridgetown, Barbados ("Bridgetown Embassy") between 2001 and 2007.

5. Defendant Eugene Sweeney ("Sweeney") is a citizen of the United States. He is a resident of Florida. He was the Consul General at the Bridgetown Embassy in August 2011. At all times relevant to this Complaint, Sweeney was an employee of the United States Department of State, headquartered in this district, as a consular officer in the Bridgetown Embassy.

6. Defendant George Deterville ("Deterville") is a citizen of Saint Lucia. He is the head of the security detail for the Prime Minister of Saint Lucia. Deterville joined a civil

conspiracy, in furtherance of which at least one overt act was taken in this district by a co-conspirator subject to the personal jurisdiction of this Court.

7. Defendant John Doe 1 ("Doe 1") is the consular officer who in 2011 revoked Frederick's A1 diplomatic and B1/B2 visas. His or her true name and address are not presently known to Frederick. At all times relevant to this Complaint, Doe 1 was an employee of the United States Department of State, headquartered in this district, as a consular officer in the Bridgetown Embassy.

8. Defendant John Doe 2 ("Doe 2") is the consular officer assigned to review Frederick's immigrant visa application, and who rejected the application on October 31, 2012. His or her true name and address are not presently known to Frederick. At all times relevant to this Complaint, Doe 2 was an employee of the United Stated States Department of State, headquartered in this district.

9. Saint Lucia, which does not have its own United States embassy, is served by the Bridgetown Embassy in Barbados.

## JURISDICTION

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

11. Pursuant to 28 U.S.C. § 1391(b)(3), venue is proper in the District in which this Complaint is filed because the defendants are subject to personal jurisdiction here.

## NATURE OF THE CASE

12. This is an action for damages brought pursuant to 22 C.F.R. § 13.3 and 22 U.S.C. § 3926, in the name of the United States for the use of Richard Frederick.

## STATEMENT OF FACTS

### Saint Lucia

13. Saint Lucia is a sovereign island country in the Eastern Caribbean Sea. It gained independence from the United Kingdom in February 1979, when it became an independent state of the Commonwealth of Nations associated with the United Kingdom.

14. The Saint Lucian Government is a parliamentary democracy and its legal system is based on English common law.

15. The Head of State is Queen Elizabeth II, represented by a Governor General, who is appointed by the Queen. The Governor General's role is ceremonial. The governing power in Saint Lucia lies with the Prime Minister and Cabinet, usually representing the majority party in parliament.

16. The bicameral parliament consists of a 17-member House of Assembly, elected by universal adult suffrage, and an 11-member Senate appointed by the Governor General.

17. Elected terms in the House of Assembly are generally five years, although in some circumstances elections may be called early.

18. Two dominant political parties make up the Saint Lucia parliament: the United Workers Party (UWP) and the Saint Lucia Labor Party (SLP). The Prime Minister heads the party that controls the majority of the members of the House of Assembly. The Prime Minister and his Cabinet exercise executive power over the island.

19. The Prime Minister appoints Cabinet ministers from among the members of his party in the House of Assembly. As such, it is typical— as in the United Kingdom and other former British colonies— for ministers to hold both legislative and executive positions concurrently.

20. Since independence, Saint Lucia has had Prime Ministers from both parties. The UWP held the office from 1982 to 1997 and from 2007 to 2011. The SLP held the office from 1997 to 2006 and from 2011 until the present.

21. Competition between the parties is fierce; politics in Saint Lucia is renowned for hardball tactics.

### Richard Frederick

22. Frederick was born on a banana plantation in Saint Lucia in 1965.

23. The tenth of 12 children, he successfully passed the entrance examination for St. Mary's college, the best boys secondary school on the island.

24. Because he had no family in the city where the school was located, he lived with family friends for one year and, thereafter, lived in a small rented wooden house, which had neither stove nor refrigerator. His sole focus was education.

25. At 17, Frederick graduated from St. Mary's College in 1982 and was preparing to enter a higher learning institution: Saint Lucia A-Level College. But when he learned that his family could not afford the advanced schooling, Frederick aborted his educational plans and sought employment.

26. On January 4, 1983, Frederick took the oath of a police officer for the Royal Saint Lucia Police Force, one of the youngest persons known to have done so.

27. Frederick trained as a police officer in Barbados and graduated in May 1983 as the Best Recruit, winning most of the trophies awarded for academic and physical training. He was not yet 18.

28. Frederick never abandoned his desire to pursue higher education. Before his contemporaries finished their two-year course of study at Saint Lucia A-Level College, he had completed A-Level law with the University of London via home study.

29. Frederick remained on the police force until 1988, when he commenced studies at the University of the West Indies, Cave Hill Campus, Barbados, pursuing a double major in Public Administration and Law. After the first year, Shell Oil Company awarded him a partial scholarship based on academic achievement.

30. In 1994, Frederick was called to the Bar of England and Wales, where he is a member of Lincoln's Inn, and to the Bar of Saint Lucia.

31. Frederick created a radio program— aptly titled "Can I Help You?"— which provided free legal advice to callers.

32. Frederick is well known for helping deprived people, representing many clients *pro bono*. For example, a young man, Charles Anzie, was accused of murder without an evidentiary basis. He had been kept in pre-trial detention for a lengthy period because he could not afford representation. Frederick took the case *pro bono* and got the charges dismissed.

33. Frederick has a reputation as a conciliator and, as a result, has assisted the government and people of Castries, Saint Lucia's capital and largest city, in quelling the high crime rate.

34. Frederick has travelled as a "Peace Ambassador" to the UK, Europe, and Korea to promote world peace.

35. Frederick also operates a construction business and, up until 2011, frequently travelled to the Miami area to purchase building supplies for his business.

36. In Spring 2006, because of a resignation, a parliamentary seat opened in Castries. With less than two weeks to prepare for the special by-election, Frederick ran for the seat and defeated SLP candidate Phillip Victor LaCorbiniere, who had resigned his post as Attorney General to run.   Frederick ran as an independent, becoming only the second independent candidate in Saint Lucia history to win a parliamentary seat.

37. Once elected, Frederick joined the UWP.   In the December 2006 general election, he was re-elected with 58.8% of the vote and the UWP won control of the House of Assembly and the Prime Minister's office.   In January 2007, Frederick was appointed Housing Minister in the new UWP government by then-Prime Minister, John Compton.

38. From the first months of his political career, Frederick's political enemies used the tactic of conveying false information about him to the Bridgetown Embassy.   Immediately after the December 2006 election (unknown to Frederick at the time), Prime Minister Compton assured the United States DCM that he had "taken steps to ensure Frederick would never take a leadership role in the UWP."   "Compton perceive[d] Frederick as a threat to his control . . . ."

39. On May 10, 2007, while Prime Minister Compton was incapacitated by a series of strokes, long-time Frederick antagonist Terrence Leonard travelled to the Bridgetown Embassy to request "evidence that the United States might have that would assist them in building a case against Fredrick [*sic*]."  Leonard met or spoke to Bridgetown Embassy officials at least five more times over the next three years and conveyed false information about Frederick to officials. Frederick's political enemies— including Jeannine Compton of the UWP (the daughter of Prime Minister Compton), LaCorbiniere of the SLP (whom Frederick had defeated in 2006), and others— continued to contact the Bridgetown Embassy through emissaries and personally, seeking information to harm Frederick politically and offering false statements about him.

7

**Frederick's Visas**

40. Frederick was issued a United States B1/B2 visa in 1984, while employed as a police officer. Frederick first visited the United States in April 1984 and visited here approximately 100 times over the next 27 years.

41. The B1/B2 visa was repeatedly reissued by the United States government, in time periods relevant to U.S. law at the time of reissuance.

42. The visa was reissued despite the false rumors about Frederick that had been relayed to the Bridgetown Embassy.

43. In January 2007, shortly after reelection to Parliament and his appointment as Housing Minister, Frederick was issued a diplomatic passport accompanied by an A1 diplomatic visa.

44. The diplomatic visa was issued despite the false rumors about Frederick that had been relayed to the Bridgetown Embassy.

45. At no time during his numerous visits to the United States did Frederick overstay the period granted by immigration authorities.

46. At no time during his numerous visits to the United States did Frederick encounter any difficulty with any United States law enforcement or any difficulty in any other capacity whatsoever.

**Cancellation of B1/B2 and A1 Diplomatic Visas**

47. Three months prior to the highly contested General Elections of November 2011, Frederick received a telephone call from an Embassy Official identifying himself as Tom Broughton õfrom the U.S. Embassy in Bridgetown,ö and informing him that his B1/B2 Visa (which had been reissued repeatedly since 1984) and his A1 diplomatic visa (obtained because of

his ministerial responsibility) had been revoked.   When Frederick asked the reason for the revocation, Broughton replied it was because of "new information that came to hand."

48.     Broughton refused to provide Frederick the substantive reason for the revocations of his visas, stating he was "not at liberty" to do so.

49.     Both visas were valid at the time they were cancelled.

50.     Frederick's visa revocations should have been confidential, but the news was leaked to the public.   It was publicized in the Saint Lucia media by Jeannine Compton, a political rival of Frederick who was among his accusers as far back as 2007-2008.   Compton stated on Saint Lucian television in September 2011, "The United States has obviously made a decision, and it is a matter of concern . . . because as a minister of government, you are to go to the United States or to go to other countries to represent Saint Lucia, and if you are not entitled to do this, how best are you going to represent Saint Lucia? **And there must have been something grave to have your diplomatic visa revoked.**"   Carmy Joseph, HTS News Channel 4 (broadcast September 19, 2011) (emphasis added).[1]

51.     The ability to travel freely to the United States is seen by the Saint Lucia public as an essential qualification for government office because of Saint Lucia's close economic relationship with the United States, far and away the island nation's largest trading partner.

52.     Frederick's political opponents in the SLP used the visa revocations scandal against him.

53.     SLP Spokeswoman Jadia Jn. Pierre-Emmanuel read from a prepared statement on September 20, 2011:   "The Saint Lucia Labor party believes that this is a matter of national concern, and in no way should its implications be trivialized . . . .   Whereas it may be true that personal visas may be frequently revoked by the U.S., this is certainly not true in the case of

---

[1] Available at https://www.youtube.com/watch?v=olSubcBfszo.

9

diplomatic visas held by respectable ministers of government." Jason Hullingseed, *Two Less Lonely!*, DBS Newsworld (September 21, 2011).[2]

54. SLP party leader (now Prime Minister) Kenny Anthony stated at a rally on September 26, 2011, "The Americans had to do for us what our own prime minister and our government should have done a long time ago!  If any one of you tonight standing here believes that the cancellation of the visas of Richard Frederick— his personal visa, and his diplomatic visa— is the end of this saga, you had better think twice!" Cecile Actille, *Go Richard?*, DBS Newsworld (Sept. 27, 2011).[3]

55. On or about November 17, 2011, Stanley Felix, Frederick's SLP opponent for the seat in Castries, stated at a rally, "Don't vote for Richard Frederick because the FBI is coming for him just after the elections."  Felix further stated, "I contacted an immigration lawyer to investigate why they revoked Richard Frederick's visas.  I paid him $300.00.  I have the letter and it says they only revoke visas for drug trafficking, human trafficking, and money laundering."[4]

56. Predictably, and as designed, the visa revocations created the false impression in the Saint Lucia public that Frederick was engaged in illegal activities and, as a result, the revocations became a major issue in the November 2011 campaign.

57. The visa revocation scandal created such a political firestorm that Frederick was forced to resign his position as Minister of Housing in September 2011.

---

[2] Available at https://www.youtube.com/watch?v=4pso8BFpcYI&list=PLkZUn4Z2vYE8XBYYyftFuf5vQl9iC6_cM.
[3] Available at https://www.youtube.com/watch?v=27pA4sJSsqI.
[4] On October 29, 2012, Frederick filed suit against Felix in a Saint Lucia court based on these false and defamatory statements.  He was awarded a default judgment, entered August 6, 2013, after the court denied Felix's motion to late-file an answer.  Under Saint Lucia rules of procedure, the case remains pending for determination of damages.

58. Then-Prime Minister Stephenson King, of Frederick's UWP party, contacted United States Embassy Chargeé d'affaires Christopher Sandrolini on September 20, 2011 requesting the reason for the revocation of Frederick's visas. Sandrolini's September 22, 2011 letter to Prime Minister King addressing the issue (Exh. A) did not disclose any reason.

59. Prime Minister King responded on September 28, 2011 (Exh. B) formally requesting "details on the decision of the US Government's revocation of the US visas of Mr. Frederick."

60. Sandrolini replied on October 12, 2011, stating "I conveyed to the State Department in Washington your request of September 28 . . . ." That letter provided no substantive details of the reason for the revocation of Frederick's visas, stating only that "Authority for visa revocation is found in section 221(i) of the INA, which provides that a consular officer or the Secretary of State may revoke a visa at any time, at his or her discretion." (Exh. C.)

61. Although Frederick was narrowly re-elected to his seat in the House of Assembly, the UWP lost its parliamentary majority in November 2011. It is widely believed that the UWP defeat was due to the visa revocations scandal.

62. The visa revocations scandal has been the subject of a least two parody songs released to the public on compact disc. It remains a regular topic of local political talk shows.

63. To date neither Frederick nor King has been given any reason for the revocation of the visas despite their several requests for such information. Specifically, Frederick has written to the Bridgetown Embassy, the State Department, and the OIG, but has received no reply.

64. As a result of the revocation of his visas, Frederick has been denied the opportunity to visit his three U.S. citizen children (two of whom are minors, ages 17 and 13) and to conduct business in the United States.

**Denial of Immigrant Visa (Green Card)**

65. Sometime in 2009 or 2010 (prior to the visa revocations), Dr. Richina Darcel Biscette, Frederick's daughter and a United States citizen, filed a petition for an immigrant visa (Green Card) for him. Dr. Biscette graduated from the University of Miami and from Emory University Medical School, which is consistently ranked among the top medical schools in the United States.

66. An immigrant visa would permit Frederick to obtain Lawful Permanent Resident status in the United States, and thus to travel, live, and work freely in the United States without need for further visas.

67. Frederick's interview for the immigrant visa did not occur until October 9, 2012, at least two years after the initial filing.

68. Frederick was informed of the denial of his non-immigrant visa by a letter ("Denial Letter") from the Bridgetown Embassy dated October 31, 2012, but which he did not receive until early 2013. The Denial Letter had been delivered to a post office at which Frederick had never before received correspondence,[5] and Frederick only serendipitously received it months later when a friend working there noticed it and delivered it to him.

69. The Denial Letter was a form "worksheet" containing a number of possible denial reasons with a box next to each reason. One of those boxes was marked with an "X" and

---

[5] Some addresses in Saint Lucia, such as Frederick's home address, are not served by postal home delivery and lack named streets.

12

indicated that Frederick's denial was pursuant to "Section 212(a)(2(C)(i) [of the INA], Controlled Substance Trafficking or activities related thereto."

70.  Frederick has never engaged in controlled substances trafficking or any related activities.  Nor has Frederick ever been charged with any type of narcotics offense or related activities.

## Discovery of the Conspiracy

71.  Not until September 2013 did Frederick finally learn the basis for the revocation of his B1/B2 and A1 diplomatic visas.  Frederick was informed through the media (Saint Lucia and others) that SLP political operatives working with United States Embassy Consular Officials conspired to have his visas revoked for improper political reasons.

72.  One SLP operative who conspired to have Frederick's visas revoked was Defendant Deterville, a former police superintendent, who presently works in SLP Prime Minister Kenny Anthony's office.  Around the time of the 2011 visa revocations, Deterville was involved in an improper personal relationship with Defendant Chainer, a former United States Embassy official, who had worked in the Bridgetown Embassy, where she maintains contacts and influence.

73.  Defendant Chainer, at Deterville's urging, conspired with United States Embassy Officials, including Defendants Hillyer, Sweeney, and Doe 1 to create a false and improper basis for revoking Frederick's visas, and then to revoke those visas to cause political embarrassment to Frederick for the political gain of the SLP and Deterville.

74.  Defendant Sweeney, in his position as Consul General, supervised the Embassy Officials responsible for the improper revocation of Frederick's visas.  In his supervisory capacity, Defendant Sweeney would have been consulted and approved the revocation of the

B1/B2 and A1 diplomatic visas of a sitting Member of Parliament and Cabinet-level minister such as Frederick.

75. As published by *Caribbean News Now* on September 25, 2013, "[i]t is now believed that Frederick's visa was revoked as a result of false information supplied by members of the Saint Lucia Labor Party (SLP) . . . with a local propaganda campaign designed to tarnish Frederick's reputation locally."  (Exh. D.)

76. The September 25, 2013 *Caribbean News Now* article contrasted Frederick's treatment to "the continued ability of two prominent Saint Lucian government officials to enter the US and effectively travel freely and with immunity/impunity on diplomatic passports when they have a known history of violent sexual assault."

77. Frederick became aware of the actions of Defendants Chainer and Hillyer October 4, 2013, when their roles were disclosed to him by a source with *Caribbean News Now*.

78. Frederick is a charismatic and popular Member of Parliament from an economically disadvantaged constituency in Saint Lucia.  SLP operatives, with the cooperation and participation of United States Embassy officials, utilized the visa process of the United States Government as part of a political, dirty-trick scheme aimed at destroying Frederick's political career and furthering their own political ambitions.

79. Revoking Frederick's United States visas— within three months of the election— was a malicious and effective means to undermine Frederick and his political party.

80. Denying the immigrant visa furthered the aim of the conspiracy by continuing the political embarrassment Frederick suffered due to his inability to travel to the United States.

81. The SLP operatives, and the United States Embassy Consular Officials who conspired with them, were aware the decision to revoke is not reviewable under U.S. law.

14

Therefore, they were aware they could deny Frederick any chance for adjudication or vindication. It was the perfect political crime to commit against a respected Saint Lucian politician and lawyer.

### COUNT 1

### Violation of 22 C.F.R. § 13.3 and 22 U.S.C. § 3926

82. Frederick repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 81 as if set forth in full.

83. Defendant Hillyer's actions in procuring in 2011 the revocations of Frederick's B1/B2 and A1 diplomatic visas at the behest of Defendant Chainer and Frederick's local political enemies constitute willful malfeasance, abuse of power, and corrupt conduct in her office.

84. Defendant Hillyer is liable to all persons injured by any such malfeasance, abuse, and corrupt conduct.

85. Defendant Doe 1's actions in revoking Frederick's visas at the behest of Defendants Hillyer and Chainer, and Frederick's local political enemies constitute willful malfeasance, abuse of power, and corrupt conduct in his office.

86. Defendant Doe 1 is liable to all persons injured by any such malfeasance, abuse, and corrupt conduct.

87. Frederick has suffered damage to his reputation, damage to his business interests, and emotional distress a result of Defendant Hillyer's malfeasance, abuse, and corrupt conduct.

### COUNT 2

### Violation of 22 C.F.R. § 13.3 and 22 U.S.C. § 3926

88. Frederick repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 87 as if set forth in full.

89. Defendant Doe 2's actions in denying on or about October 31, 2012 Frederick's application for an immigrant visa, on the basis of knowingly false allegations, constitutes willful malfeasance, abuse of power, and corrupt conduct in his office.

90. Defendant Doe 2 is liable to all persons injured by any such malfeasance, abuse, and corrupt conduct.

91. Frederick has suffered damage to his reputation, damage to his business interests, and emotional distress a result of Defendant Doe 2's malfeasance, abuse, and corrupt conduct.

## COUNT 3

### Conspiracy to violate 22 C.F.R. § 13.3 and 22 U.S.C. § 3926

92. Frederick repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 91 as if set forth in full.

93. Defendants Hillyer, Chainer, Sweeney, Deterville, Doe 1, Doe 2, and other Unnamed Co-conspirators within the SLP and at the State Department headquarters in Washington, D.C., formed an agreement to commit a wrongful act: to wit, to interfere in local Saint Lucia politics and to embarrass and humiliate Frederick by procuring in August 2011 the revocations of Frederick's B1/B2 and A1 diplomatic visas to the United States on false information and without cause, and by continuing Frederick's embarrassment and humiliation by denying in October 2012 his immigrant visa application.

94. The object of this conspiracy was to cause consular officers to engage in acts of willful malfeasance, abuse of power, and corrupt conduct in their offices.

95. State Department regulations state: "In cases involving foreign government officials, prominent public figures, and subjects or potential subjects of the United States and foreign criminal investigations, **post should seek the Department's guidance prior to any visa**

**revocation unless unusual and exigent circumstances prevent such a consultation**. You should be alert to the political, public relations and law enforcement consequences that can follow a visa revocation, and should work with the Department to ensure that all legally available options are fully and properly addressed. The revocation of the visa of a public official, or prominent local or international person, can have long-term repercussions on political relationships with foreign governments and on our public diplomacy goals in a foreign state." 9 F.A.M. § 41.122 N4 (emphasis added).

96. Per State Department regulations, Unnamed Co-conspirators at the State Department headquarters in Washington, D.C. were consulted about and approved the revocation of Frederick's B1/B2 and A1 diplomatic visas for improper purposes.

97. Unnamed Co-conspirators' actions in Washington, D.C., to wit, approving the revocation of Frederick's B1/B2 and A1 diplomatic visas for improper purposes, were overt acts in furtherance of the conspiracy.

98. Unnamed Co-Conspirators' actions in Washington, D.C., to wit, instructing Sandrolini to provide no substantive response to the Prime Minister King's September 28, 2011 formal request for "details on the decision of the US Government's revocation of the US visas of Mr. Frederick," were overt acts in furtherance of the conspiracy.

99. Frederick has suffered damage to his reputation, damage to his business interests, and emotional distress a result of the conspiracy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests a judgment in its favor for the use of Richard Frederick for compensatory and punitive damages in the amount of $25 million and such further relief as may be just and equitable.   Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

UNITED STATES OF AMERICA *for the use of*
RICHARD FREDERICK

DATED:   February 25, 2014        By: _____

Joseph E. diGenova, DC Bar # 73320
Victoria Toensing, DC Bar # 304980
Brady C. Toensing, DC Bar # 452672
diGENOVA & TOENSING, LLP
1776 K Street, N.W., Suite 737
Washington, D.C. 20006
(202) 289-7701
(202) 289-7706 (fax)

Counsel for Richard Frederick